

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-10-00114-CR

_____

MICHAEL JAY BAYS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th Judicial District Court
Gregg County, Texas
Trial Court No. 38,316-A

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Michael Jay Bays appeals his convictions for continuous sexual assault of a child and sexual assault of a child. His ten points of error can be grouped as follows: challenges to the sufficiency of the evidence to support the convictions; improper admission of hearsay testimony; improper admission of expert testimony; the constitutionality of the continuous sexual assault statute; and the cumulative effect of these purported errors. We affirm the trial court's judgment because (1) sufficient evidence supports the conviction for continuous sexual abuse of a child, (2) sufficient evidence supports the conviction for sexual assault of a child, (3) "outcry" testimony from great-grandmother Jean was admissible as a prior consistent statement, (4) admitting expert testimony from Kelsey Drennan was within the discretion of the trial court, (5) admitting expert testimony from Bunny Terrell was within the discretion of the trial court, (6) admitting expert testimony from Jamie English was within the discretion of the trial court, (7) it was not error to admit testimony that two complainants' statements are "consistent," (8) Section 21.02 of the Texas Penal Code does not apply to a bench trial, and (9) there was no cumulative error.

*(1)*     *Sufficient Evidence Supports the Conviction for Continuous Sexual Abuse of a Child*

Bays was charged in three indictments, alleging various sexual offenses against three girls, who we will refer to as Charlotte, Emily, and Anne.[1] In the first indictment, resulting in this appeal, Bays was charged, in count one, with the offense of continuous sexual assault of Charlotte;

---

[1]The trial court rendered an acquittal for the charges alleging an offense against Emily. The indictment alleging an offense committed against Anne is addressed in our opinion in cause number 06-10-00115-CR.

2

and in count two, with the offense of sexual assault of Charlotte.[2]   After a six-day bench trial, the trial court found Bays guilty of both counts alleged to have been committed against Charlotte, and sentenced Bays to twenty-five and ten years' imprisonment, respectively.   On appeal, Bays challenges the sufficiency of the evidence to support these two convictions.

In evaluating the legal sufficiency of the charged offense, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the crime beyond a reasonable doubt.   *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd).   Our rigorous legal sufficiency review focuses on the quality of the evidence presented.   *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring).   We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."   *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

Charlotte, Bays' step-granddaughter, testified to the trial court.   At the time of her testimony, she was fourteen years old and in the eighth grade.   She had lived with Bays and his wife, Barbara, before Charlotte's fifth-grade school year, and there was both a pool and hot tub at

---

[2]*See* TEX. PENAL CODE ANN. § 21.02 (West Supp. 2011), § 22.011 (West 2011).

the house.[3]    In the pool or hot tub Bays touched Charlotte under her bathing suit.    He touched her "boobs," and put his fingers in her vagina and moved his fingers.    "It happened a few times, maybe three."    On one occasion, in the hot tub, other adults were by the hot tub when Bays put his fingers in Charlotte's vagina, and Charlotte thought her mother knew it was happening.    Later, when Charlotte told her mother, though, her mother "flipped out."    That led Charlotte to conclude that her mother had not known what was occurring in the hot tub.    Charlotte said she told Barbara about the abuse several times, but was not believed, or that Barbara did nothing about Charlotte's reports.    She tried to tell her great-grandmother Jean; this was when Charlotte was "a little older than" Emily, who was ten years old at the time of trial.    But Charlotte admitted she "probably made it seem like an accident because I wasn't taking it too seriously, I guess.    It's a little hard to remember since it was, like, five years ago."

Charlotte described other occasions, while she was living in the Bays home, where Bays would engage in inappropriate touching.    Bays took Charlotte to parades and water parks. Sometimes Emily and Barbara would attend, and sometimes not.    Charlotte explained how sometimes they would not arrive at the destination:

---

[3] By all accounts, Charlotte had not had an easy upbringing.    Her mother was only sixteen when she had Charlotte—the product of sexual abuse by a so-called boyfriend of Charlotte's mother.    Charlotte's mother had difficulty keeping a job; drug abuse problems; and a series of men in her life who were not sterling figures in Charlotte's childhood.    Part of Bays' defensive theory stressed a request by Charlotte's mother to borrow money from Bays and his wife, Charlotte's grandmother.    Charlotte acknowledged using illegal drugs and alcohol and cutting and burning herself.

> Either he would stop to mess with me or we wouldn't go or we'd have to turn back and go. But, I mean, most of the time we'd go to the parade, but we'd end up stopping for that reason, and then we end up going back - - like going to the parade.

"Messing with" meant "[t]ouching me in places that I shouldn't be touched at . . . My vagina and just everywhere really." This touching was done with Bays' fingers. Charlotte said these events continued over a span of "probably five or six years. Ever since I lived there, ever since I started living there, and ever since I moved. It happened a few times after I moved . . . ." Sometimes Bays made Charlotte hold his penis, with his hand on top of hers to "squeeze it [and] move it." This kind of touching occurred "five times at most." Bays also "made [Charlotte] pretty much give him oral sex more than one time . . . . Well, one time he tried to, but it didn't work out too well, because - - it just didn't happen as well as he planned. But the second time that it - - it happened." No acts of oral sex are alleged in the indictment. At the time of trial, Charlotte had recently turned fourteen. When asked by the State whether "some of these things happen[ed] in 2007 and 2008 and 2009?" and if "it happen[ed] more than two or three times in those years?" Charlotte replied, "Yes" to both questions. Charlotte also described riding a four-wheeler, with Bays seated behind her; he was touching her vagina, asking if it felt good, but she did not state whether he was touching her inside or outside of her clothes. Charlotte was certain of the last time Bays assaulted her—her birthday, February 3, 2009. However, that incident was made the subject of a separate count in the State's indictment for sexual assault of a child, resulting in a separate conviction, which we discuss later in this opinion.

5

We first review the sufficiency of the evidence to prove the continuous sexual assault allegation. Based on the indictment and the statute, the State had to prove that, over a span of thirty or more days, Bays committed two or more acts of sexual abuse against Charlotte. *See* TEX. PENAL CODE ANN. § 21.02. The indictment alleged those acts of sexual abuse to be indecency with a child by contact, by touching Charlotte's genitals; indecency with a child by causing Charlotte to touch Bays' genitals;[4] and sexual assault by penetrating Charlotte's sexual organ with Bays' finger.[5] The indictment alleged Bays committed these acts over a period "from on or about January 1st 2008 through January 30th 2009," during which period Bays was seventeen years of age or older and Charlotte was fourteen years old or younger and not Bays' spouse.

Bays' defense was to challenge Charlotte's credibility and the degree of specificity in her testimony. Through his cross-examination of State's witnesses and in recalling Charlotte to the stand, Bays emphasized Charlotte's history of drug abuse and hospitalization for mental issues, which included prescription antidepressants and medication used to treat bipolar disorder and schizophrenia. Bays impeached Charlotte's testimony by playing for the trial court limited sections of a forensic interview where Charlotte, about ten months before trial, made allegations of the sexual abuse to Drennan, an interviewer for the Longview Children's Advocacy Center.[6]

---

[4]*See* TEX. PENAL CODE ANN. § 21.11(a)(1) (West 2011).

[5]*See* TEX. PENAL CODE ANN. § 22.011.

[6]Charlotte's video interview was offered into evidence by Bays for the limited purpose of impeaching the complainant's testimony; by all accounts, it was not viewed in full by the trial court or considered as substantive evidence of the charged offenses. We have not considered any allegations made by Charlotte in the video-recorded

Charlotte acknowledged that, in that earlier statement, she made no allegations of oral sex, or "rape," which she clarified as meaning penetration of her sexual organ with Bays' sexual organ. Also, during her subsequent examination, Bays questioned Charlotte about an incident she described where she told Drennan that Charlotte, Emily, and Anne were all sitting on Bays' lap in the living room of Bays' house. However, at trial, Charlotte had said that only Emily and Anne, not Charlotte, were on Bays' lap. Questioned about this inconsistency, Charlotte said, "I must have made that part up because I was not sitting on his lap." Bays cites this testimony as a distilled example of Charlotte's untrustworthiness.

Bays also presented several schoolmates of Charlotte, who opined she was not believable and often told lies. The State played a video interview Bays gave to police shortly after they began their investigation. Bays said in the video he may have accidentally touched the girls while playing. When he testified at trial, Bays said he had not slept much the night before giving that statement, as he was distraught when Child Protective Services (CPS) removed his daughter Emily from the home.

Part of Bays' argument is that, because Charlotte offered no specific dates for any of the sexual offenses (except for the incident she said occurred on her birthday, addressed below), the State failed to prove its allegations. The statute does not require specific dates. Bays also argues that, because Charlotte alleges some of the events occurred before January 1, 2008, there is no way

interview as substantive evidence in our review. The video interviews of the other two girls were admitted as evidence for all purposes.

7

of knowing which, if any, alleged incidents occurred before that date. There is no indication, and Bays has presented no authority, that the general rule that the State is not bound by the specific dates in an indictment does not apply to Section 21.02 of the Texas Penal Code. *See Scoggan v. State*, 799 S.W.2d 679, 680 n.3 (Tex. Crim. App. 1990). As we have stated, though, Charlotte answered affirmatively when asked if the abusive acts occurred more than twice in a span of time including 2007, 2008, and 2009. A child-victim's testimony is sufficient to support a conviction for sexual assault. TEX. CODE CRIM. PROC. ANN. art. 38.07 (West Supp. 2011); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978); *Halbrook v. State*, 322 S.W.3d 716, 720 (Tex. App.—Texarkana 2010, no pet.). Logically, a child's testimony alone is also sufficient to establish the predicate offenses to prove continuous sexual assault of a child. The finder of fact resolves any disputes in testimony. *Hooper*, 214 S.W.3d at 13 (citing *Jackson*, 443 U.S. at 318–19). The fact-finder is the exclusive judge of each witness' credibility and the weight to be given each witness' testimony. *Whitaker v. State*, 977 S.W.2d 595, 598 (Tex. Crim. App. 1998). The evidence is legally sufficient to support the conviction for continuous sexual assault of a child. We overrule that point of error.

*(2)     Sufficient Evidence Supports the Conviction for Sexual Assault of a Child*

Bays also contends that the evidence was insufficient to support his conviction for sexual assault of a child, alleged in count two of the indictment. The State's charge alleged that, on or about February 4, 2009, Bays caused the penetration of Charlotte's sexual organ with Bays' finger.

8

Charlotte was fourteen at the time of trial, so she was clearly younger than seventeen at the time of the alleged offenses. *See* TEX. PENAL CODE ANN. § 22.011. Bays argues that, because the indictment alleged the offense happened on or about February 4, 2009, but Charlotte emphatically stated the last time Bays assaulted her was on her birthday, February 3, 2009, the State failed to prove its allegation.

The State is not required to allege a specific date in an indictment. *Sledge v. State*, 953 S.W.2d 253, 255 (Tex. Crim. App. 1997) (citing *Mitchell v. State*, 330 S.W.2d 459, 462 (Tex. Crim. App. 1959)). The "on or about" language is sufficient, so long as the act occurred before the date of the presentation of the indictment, but within the relevant limitations period. *Id.* at 256; *Thomas v. State*, 753 S.W.2d 688, 693 (Tex. Crim. App. 1988). Bays argues that, because Charlotte was unequivocal that the last abusive act perpetrated on her was on her birthday, the day before the indictment's allegation date, there was no evidence proving the indictment's allegation. Bays, though, offers no legal authority why the above clearly established caselaw does not govern the instant situation. He directs us to a footnote in *Duron v. State*, 956 S.W.2d 547, 551 n.3 (Tex. Crim. App. 1997), where the Texas Court of Criminal Appeals said, "Of course, a defendant may complain, for the first time on appeal, that the specific incident of a statutory offense for which he was convicted differs from the specific incident (of the same statutory offense) for which he was indicted." However, *Duron* addressed the sufficiency of an indictment to charge an accused with an offense. The quoted footnote went on to say, "[an accused] cannot complain, for the first time

9

on appeal, that the indictment is defective in that it did not reflect those details (and, thus, did not allow him to know what specific incident the grand jury passed upon). Pursuant to Art. 1.14(b), he must make that objection before trial." This citation concerned preservation of error and challenges which could or could not be made to the sufficiency of the charging instrument to provide the defendant with notice of the charged crime, not as authority that the State must prove a specific date alleged in the indictment.[7] Bays also directs us to Professors Dix and Dawson in the second edition of the Texas Practice series, where the authors express consternation at this particular facet of Texas indictment law. Nonetheless, the Texas Court of Criminal Appeals' ruling in this area is clear.

Although Charlotte said the sexual assault happened February 3, and the indictment alleged it occurred the next day, under Texas caselaw this is sufficient. As for the substance of the allegation, Charlotte said Bays "raped" her on February 3, 2009. When describing previous abuses she described Bays putting his finger in her vagina. Regarding the incident on February 3, Charlotte said, "He had pretty much just done what he usually did, but he was - - he was drunk, and that doesn't give him any excuse, but he - - he raped me." The State asked if Bays penetrated her

---

[7]Bays does not specifically complain that the State did not elect which conduct on which it was relying for a conviction, but he does allude to election in his brief. A point of error should be based on a single legal theory, lest it risk being overruled as being multifarious. *See* TEX. R. APP. P. 38.1 Even if we were to treat Bays' allusion to election as properly briefed, we find no place in the record where Bays asked the trial court to require the State to make an election as to which conduct on which it was relying as a basis for conviction. *See Scoggan*, 799 S.W.2d at 680 n.3 (when evidence shows two or more acts of intercourse, each of which is an offense for which defendant may be convicted, and indictment charges only one offense, State is required to elect the act on which it will rely to secure conviction, provided accused makes motion for election); *O'Neal v. State*, 746 S.W.2d 769, 771 n.3 (Tex. Crim. App. 1988).

vagina, and Charlotte said, "Yes." A short time later the prosecutor asked, "You said on that day he did the same thing that you already testified that he did to you before, penetrating you, using his hands on you?" "Yes." It is true that, when Bays called Charlotte to testify in the defense case, she said that this act of penetration involved Bays' sexual organ penetrating her sexual organ, but this does not preclude the earlier testimony which supports a finding of digital penetration. The evidence is sufficient to support a finding of guilt beyond a reasonable doubt for the offense of sexual assault. We overrule this point of error.

*(3)* *"Outcry" Testimony from Great-Grandmother Jean Was Admissible as a Prior Consistent Statement*

In two points of error argued together, Bays complains that Charlotte's great-grandmother, Jean, was allowed to testify to an extraneous offense and that Jean was not a proper outcry witness. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072 (West Supp. 2011). Bays did not object on the basis that the evidence was of an extraneous offense, so we overrule that contention. *See* TEX. R. APP. P. 33.1.

Jean testified that, when Charlotte was about age seven, she told Jean, "Mamaw, [Bays] touched me . . . I don't like him." Jean said Charlotte "didn't tell me anything - - she stopped; she didn't tell me anything else but that she and [Emily] were in the bed with Michael." Bays complains the State's notice of intent to produce Jean's testimony as outcry evidence was initially designated to be offered only in the punishment phase. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(1)(B). The trial court, though, found that a subsequent notice letter from the State

11

gave adequate notice that Jean's testimony would be offered at the guilt/innocence phase. We do not find an abuse of discretion in the trial court's admission of Jean's statement, given the trial court's finding of adequate notice to Bays. *See Tear v. State*, 74 S.W.3d 555, 558 (Tex. Crim. App. 2002).

Bays also argues that Jean's statement did not qualify as outcry evidence. We agree. The outcry statement must be one that "in some discernible manner describes the alleged offense." *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990). It also "must be more than words which give a general allusion that something in the area of child abuse was going on." *Id*. By adding the outcry exception to the statute, the Legislature "was obviously striking a balance between the general prohibition against hearsay and the specific societal desire to curb the sexual abuse of children." *Id*. "[T]he societal interest in curbing child abuse would hardly be served if all that 'first person' had to testify to was a general allegation from the child that something in the area of child abuse was going on at home." *Id.* Jean's description of Charlotte's statements allegedly describing abuse by Bays are only general allegations suggesting something in the realm of child abuse had occurred. The statements did not qualify under the outcry statute.

The State argues, however, that Jean's testimony is admissible as a prior consistent statement from Charlotte. *See* TEX. R. EVID. 801(e)(1)(B). Jean testified on the first day of the six-day bench trial, but already Bays' defensive strategy had been demonstrated. Bays assailed Charlotte's reliability and suggested that she fabricated her allegations, perhaps because her

12

mother wanted money from the Bayses; and he claimed that Charlotte was responsible for coaching the other two girls' allegations, if not having outright convinced them to fabricate their allegations. A statement is not hearsay, and is therefore admissible, where the following criteria are present:

> (1) the declarant must testify at trial and be subject to cross-examination;

> (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent;

> (3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; and,

> (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose.

*Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007). Here, Charlotte testified at trial, and was subject to cross-examination. Through his examination of the State's witnesses and his case-in-chief, Bays asserted that Charlotte was untruthful and had fabricated her allegations. The statement offered by Jean was consistent with Charlotte's trial testimony. According to Jean, the prior statement by Charlotte was made when Charlotte was seven years old, about seven years before trial. This appears to be well before the supposed motive to fabricate that Bays suggested at trial; it was certainly before Charlotte's mother was refused a loan by Bays and his wife (Charlotte's maternal grandmother, Barbara Bays), an event that occurred in May 2009. A trial court's ruling on a prior consistent statement is reviewed for an abuse of discretion. *Lawton v. State*, 913 S.W.2d 542, 561 (Tex. Crim. App. 1995). The trial court was within its discretion to

13

admit Jean's recitation of Charlotte's statements.[8]  Where a trial court's decision to admit

evidence was within the zone of reasonable disagreement and was correct under any theory of law

applicable to the case, the admission will be upheld.  *Walters v. State*, 247 S.W.3d 204, 217 (Tex.

Crim App. 2007).  We overrule this contention of error.[9]

*(4)     Admitting Expert Testimony from Kelsey Drennan Was Within the Discretion of the Trial
        Court*

Bays complains, in three points of error, that the trial court erred in admitting testimony

from three State's witnesses who the State presented as experts in the field of child sexual abuse.

This field of study is classified as a "soft science," akin to psychology.[10]  The reliability of "soft"

scientific evidence may be established by showing that (1) the field of expertise is a legitimate one,

(2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's

---

[8]Additionally, testimonial allusions to Charlotte having made allegations that Bays inappropriately touched her came in at other occasions in the trial.  Charlotte said she tried to tell Jean something about Bays' conduct "about four or five" years before her trial testimony, when she would have been nine or ten.  Charlotte also said the first time Bays abused her was when she was in first grade, when she was about six or seven.  And the video interview of Emily was played for the trial court; in that interview, Emily said she had seen Bays touch Charlotte when Charlotte was seven; but Emily would have been three years old at the time.  If a defendant objects to the admission of evidence, but the same evidence is subsequently introduced from another source without objection, the defendant waives his or her earlier objection.  *Massey v. State*, 933 S.W.2d 141, 149 (Tex. Crim. App. 1996).

[9]The State also argues that the statements related by Jean were alternatively admissible under Article 38.37.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.37 (West Supp. 2011).  We disagree.  Although the statements could qualify as relevant to the previous relationship between Bays and Charlotte, this would not hurdle the fact that Jean's statements would still be relating hearsay.  The statements would not be admissible under Article 38.37 of the Texas Code of Criminal Procedure.

[10]*See Chavarria v. State*, 307 S.W.3d 386, 391–92 (Tex. App.—San Antonio 2009, no pet.); *Dennis v. State*, 178 S.W.3d 172, 181–82 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *Jensen v. State*, 66 S.W.3d 528, 542–43 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd); *Hernandez v. State*, 53 S.W.3d 742, 744, 750–51 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (generally finding child sexual assault or abuse to be legitimate field of expertise for *Nenno*'s "soft science" standard).

14

testimony properly relies on and/or uses the principles involved in the field. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999). We review a trial court's ruling on the admissibility of scientific expert testimony for an abuse of discretion. *Weatherred*, 15 S.W.3d at 542.

One challenged expert witness was Drennan, who conducted forensic interviews of Charlotte and two other alleged victims of Bays. The trial court overruled Bays' objection and accepted Drennan, who conducted video-recorded forensic interviews of the three girls, as an expert in the field of forensic interviewing and child sexual abuse. Drennan summarized her education, training, and qualifications as: she had been an investigator with CPS for three-and-a-half years; had a bachelor's degree in psychology; had training in forensic interviewing and had conducted more than 500 interviews, which were subject to peer review. Though she had not been subject to peer review since leaving the child advocacy centers for whom she conducted the interviews, the methods she used were generally accepted in the scientific community. When asked about the training she had had to qualify her in the field of child sexual assault, Drennan said generally that she had received training on physical and sexual abuse, family dynamics, and drug use, but gave no specifics. She had investigated "many" allegations of child sexual abuse, testified "many" times in civil and family courts, and qualified on at least one occasion as an expert by a trial court, though no specific field was specified.

15

When Bays voir dired Drennan on her qualifications, she could not remember where she took her certification class for forensic training, just that it was in Houston and was put on by the Children's Advocacy Centers of Texas. Although she was familiar with an organization called the National Children's Alliance, she was not familiar with that organization's guidelines. She did not have a "written protocol" for conducting interviews, though, according to Bays' counsel's question, the organization "suggests that anyone certified to do these [interviews] have written protocols." Bays' voir dire questions to Drennan all concerned her training and expertise in forensic interviewing and did not delve into her training for her expertise on child sexual assault.

Drennan's statements were within the scope of her experience dealing with sexually abused children; in addition to her experience as a forensic interviewer of children, she had more than three years of experience as an investigator for CPS. The evidence that Drennan was properly using or relying upon the principles of that field of study was not as apparent. Drennan was vague regarding her specific training in the field of child sexual assault and did not refer to any publications of studies which informed her opinions.

On balance, based on Drennan's testimony about her experience investigating child abuse and the methods she used to conduct interviews of children, the trial court could have inferred that Drennan properly applied the principles used in the field of study.[11] The trial court was within its discretion in admitting Drennan's testimony as an expert in the field of child sexual assault.

---

[11]Further, the testimony of Drennan "was sufficiently tied to the facts to meet the simple requirement that it be 'helpful' to the" finder of fact. *Jordan v. State*, 928 S.W.2d 550, 556 (Tex. Crim. App. 1996).

*(5)     Admitting Expert Testimony from Bunny Terrell Was Within the Discretion of the Trial Court*

Although Bunny Terrell never counseled or interviewed any of the three complainants, the State presented her as an expert on child sexual abuse to testify about behaviors exhibited by child victims of sexual assault. Bays complains that Terrell was not qualified as an expert in this field.

Although Terrell's bachelor's degree was in business management, her master's degree was in social work. She acknowledged little to none of her college classes concerned child abuse, but she had been taking continuing education classes for about fourteen years and had interviewed thousands of persons—victims and alleged perpetrators—in her years as a CPS investigator. With CPS, she was designated "Worker 5" level, which meant she investigated sensitive or difficult cases, including those involving death of a child or serious physical or sexual abuse. She also worked five years as a forensic interviewer of children and taught child abuse investigation to law enforcement personnel. Terrell counseled child physical and sexual assault victims, was a licensed master social worker, and had accumulated approximately half of the necessary clinical hours to be certified as a licensed clinical social worker.

Based on Terrell's training and experience, her testimony on traits and behaviors exhibited by child sexual assault victims was within her field of knowledge. Like Drennan, Terrell said the techniques she used in forensic interviewing were generally accepted by the scientific community. Experience and use of accepted procedures could conceivably be relevant to the field of child sexual abuse. Unlike Drennan, Terrell was able to reference some specific publications she had

17

studied in the field.   Based on Terrell's claimed experience and training, the trial court could have found Terrell had properly applied the principles of the field of study to reach her opinions.   *See Jordan*, 928 S.W.2d at 555–56.   We overrule this contention of error.

*(6)      Admitting Expert Testimony from Jamie English Was Within the Discretion of the Trial Court*

Following Bays' case-in-chief, the State offered English in rebuttal, as an expert in the field of child sexual abuse.[12]   English had counseled Charlotte following that girl's allegations against Bays.   English's bachelor's and master's degrees were in social work; she had more than 3,000 hours of clinical experience in counseling and was an adjunct professor of social work at Stephen F. Austin University.   She also had experience as an investigator with CPS and as a forensic interviewer of abused children.   English had counseled several dozen children suspected of being sexually or physically abused.   She was working toward obtaining clinical licensing, which required her to work with a supervisor who conducted peer review of her counseling.   She took continuing education classes in the fields of child abuse, poverty, mental health and spirituality, and ethics, but did not specify how many hours or how recently she had had those classes.   She had testified as an expert in forensic interviewing and child abuse in ten or twelve district courts.

---

[12]There is some question whether Bays objected to English's qualifications as an expert in this field, which is the subject of his appellate complaint.   At trial, Bays objected to the rebuttal topics for which the State wanted to present English:   that Charlotte exhibited behaviors consistent with a sexually abused child; why a child may be reticent regarding abuse; and English's evaluation of a child's level of description.   Bays complained these topics were not proper rebuttal testimony, as they did not address issues or evidence he had brought up in his defensive case.    Only after conducting a voir-dire examination of English did Bays tell the trial court he "renew[ed] [his] objection to her expertise."   Assuming this was sufficient to preserve his objection, we will address this point of error.

18

Based on English's counseling sessions with Charlotte, English concluded that Charlotte had been consistent in her statements that Bays sexually abused her. English also said Charlotte's history of cutting herself was consistent with a sexual abuse victim; as is her having difficulty talking about the abuse, such as oral sex. According to English, it may be years before some abuse is disclosed. This testimony was relevant as rebuttal or to explain why Charlotte did not allege oral sex or "rape" until she testified at trial. Likewise, English's testimony about the importance of a child relating sensory details was relevant—English said if a child is making things up they tend to leave out details.

Given the authorities cited above, we also find that English was qualified to offer her opinion as an expert on the topic of child sexual abuse. Her testimony was within the field, and she applied the principles of the field to questions about the instant case. In the words of the *Jordan* court, there was a "fit" between English's opinion testimony and the facts of the instant case. *See id.*, 928 S.W.2d at 556. The trial court did not abuse its discretion in admitting English's testimony. We overrule this contention of error.

*(7)    It Was Not Error to Admit Testimony that Two Complainants' Statements Are "Consistent"*

Bays complains that hearsay was admitted when Drennan was permitted to testify that statements made by Anne (the complainant in cause number 06-10-00115-CR) were consistent with the allegations made by Charlotte. Without objection, Drennan made the same statement

19

with regard to all three girls' statements later in her testimony. Bays thus failed to preserve any error for appellate review.

Kelsey Drennan was asked, and answered, as follows:

> Q. [Are Charlotte and Anne] consistent with each other?
>
> A. Yes.
>
> Q. And again I want to - -
>
> [Defense counsel]: I'm sorry, I didn't understand the question or the answer in that last one.
>
> THE COURT: Restate your question, please.
>
> Q. [Prosecutor] Was [Charlotte]'s outcry through the statements that she made to you consistent with [Anne]'s statements to you?
>
> A. Yes.
>
> [Defense counsel]: Objection, hearsay.
>
> THE COURT: Overruled.

Bays claims this is a "back-handed way to get before the trier of fact inadmissible hearsay." He also claims this testimony from Drennan bolstered Charlotte's testimony.

A short time later, Drennan was asked, "When speaking with [Emily], did you find what she had to say consistent with [Anne] and [Charlotte]?" Drennan said, "Yes." Bays lodged no objection to this testimony. Any error in the admission of evidence is cured when the same

20

evidence comes in elsewhere without objection.  *Ethington v. State*, 819 S.W.2d 854, 858–59 (Tex. Crim. App. 1991); *Massey*, 933 S.W.2d at 149.  Drennan's testimony that the three girls' statements were consistent with each other necessarily means statements of the first two girls were consistent with each other.  By failing to object to the second question regarding consistency among the three girls' statements, Bays waived any complaint as to the consistency between just Anne and Charlotte.[13]

We overrule this contention of error.

*(8)*     *Section 21.02 of the Texas Penal Code Does Not Apply to a Bench Trial*

Bays complains that Section 21.02 of the Texas Penal Code, under which he was charged with continuous sexual assault of a child, is facially unconstitutional.  Bays' argument assails the

---

[13]The State directs us to *Head v. State*, 4 S.W.3d 258, 262–63 (Tex. Crim. App. 1999), where the investigator testified that he took written statements from the child victim, her mother, and the child's aunt, who was the State's outcry witness.  The outcry witness testified first, then the investigator, Peterson.  Peterson was asked if the statements he received from the child and the outcry witness were consistent with each other:  Peterson said they were.  *Id.* at 260. Without explicitly ruling on whether this statement constituted hearsay, the Texas Court of Criminal Appeals said the analysis should focus on whether the challenged testimony "produces an 'inescapable conclusion' that the evidence is being offered to prove the substance of an out-of-court statement."  *Id.* at 262 (quoting *Schaffer v. State*, 777 S.W.2d 111, 114 (Tex. Crim. App. 1989)).  The Texas Court of Criminal Appeals eventually said the situation was "a close case" and "clearly within the trial court's discretion to conclude that the testimony did not reveal to the jury the substance of the out-of-court statements.  The disputed testimony revealed only that the three statements related basically the same facts; it did not reveal the substance of what those facts were.  Neither did any other evidence, at that point in the trial, indicate the contents of any of the three statements, what facts the statements had in common, or how any of the facts were consistent.  At best, when the trial court ruled on the admissibility of the testimony, the jury may have been able to deduce what the child-complainant had told Peterson by referencing what she had told her aunt. The trial court could have reasonably determined that this sort of inferential leap did not provide the requisite degree of certainty "that the State's sole intent in pursuing this line of questioning was to convey to the jury" the contents of the out-of-court statements.  *Id*.

Even if Bays had preserved this complaint for our review, the trial court was within its discretion to overrule the hearsay objection.  As in *Head*, the child victim had not testified at the time the witness said other witnesses were "consistent" with the complainant's statement.  Drennan, the witness in the instant case, did not reveal the specific statements or details of the allegations made by Charlotte or Emily.  There was no "inescapable conclusion" that Drennan's testimony was offered to prove statements made outside the courtroom.  *See id.* at 261.

21

statute's provision that, where a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. The jury must agree unanimously that the defendant, during a period that is thirty or more days in duration, committed two or more acts of sexual abuse. TEX. PENAL CODE ANN. § 21.02. A party seeking to invalidate a statute "on its face" bears a heavy burden of showing that the statute is unconstitutional in all of its applications. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Santikos v. State*, 836 S.W.2d 631, 633 (Tex. Crim. App. 1992) (challenger must establish that no set of circumstances exists under which statute is valid).

Bays waived a trial by jury; the trial court was the finder of fact in this case. Thus, the provision in Section 21.02 does not apply here. The subsection states:

> If a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. The jury must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse.

TEX. PENAL CODE ANN. § 21.02(d). Here, because the jury was not the finder of fact, the statute about which Bays complains had no effect on, or applicability to, him. Where the finder of fact is one person, the trial court, there can be no question of unanimity. *See Phillips v. State*, 193 S.W.3d 904, 915 (Tex. Crim. App. 2006) (Keller, J., concurring) (jury unanimity of concern only in jury trials, i.e., not an issue in bench trials). Because the subsection about which Bays

22

complains was not germane to his conviction, we decline to address this issue. We are prohibited from issuing an advisory opinion, the distinctive feature of which is that it decides an abstract question of law without binding the parties. *See* TEX. CONST. art. II, § 1; *Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000).[14]

We overrule this contention of error.

*(9)    There Was No Cumulative Error*

In his final point, Bays claims the aggregate effect of the errors he has alleged adversely affected his substantial rights. *See* TEX. R. APP. P. 44.2(b). Errors may be found harmful in their cumulative effect. *See Feldman v. State*, 71 S.W.3d 738, 757 (Tex. Crim. App. 2002). The only error we have found in this appeal was the admission of great-grandmother Jean's testimony as an outcry witness; but we found that error obviated by other evidentiary rules. Accordingly, we overrule this point of error.

We affirm the trial court's judgment.

Josh R. Morriss, III
Chief Justice

Date Submitted:    October 19, 2011
Date Decided:      December 7, 2011

---

[14]At least three Texas appellate courts have found that Section 21.02 of the Texas Penal Code is constitutional and that it does not allow for nonunanimous jury verdicts. *See Martin v. State*, 335 S.W.3d 867, 873 (Tex. App.—Austin 2011, pet. ref'd); *Reckart v. State*, 323 S.W.3d 588, 601 (Tex. App.—Corpus Christi 2010, pet. ref'd); *Render v. State*, 316 S.W.3d 846, 858 (Tex. App.—Dallas 2010, pet ref'd).

Do Not Publish